**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Media General, Inc.,** ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| **v.** ) | **Case No. _____** |
| ) | |
| **Schurz Communications, Inc.,** ) | |
| ) | |
| **WAGT Television, Inc.,** ) | |
| ) | |
| *-and-* ) | |
| ) | |
| **Gray Television Group, Inc.** ) | |
| ) | |
| *Defendants.* ) | |
| ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING**
**ORDER AND PRELIMINARY INJUNCTION**

Plaintiff Media General, Inc. ("Media General") hereby moves for a temporary

restraining order and preliminary injunction against Defendants Schurz Communications, Inc.

and its subsidiary WAGT Television, Inc. (collectively, "Schurz") and Defendant Gray

Television Group, Inc. ("Gray") enjoining (1) the closing of the sale of the television station

WAGT to Gray; (2) the transfer of WAGT programming to Gray; (3) the sale of WAGT

bandwidth in the spectrum auction conducted by the Federal Communications Commission

("FCC"); and (4) further solicitation by Gray of Media General's customers.

Because Gray has asserted to Media General's customers that the closing of Schurz's sale

of WAGT to Gray and the transfer of WAGT programming to Gray will occur as early as

February 1, 2016, immediate and irreparable injury, loss, and damage will result to Media

General unless a temporary restraining order is issued before February 1, 2016.

Pursuant to LCvR 65.1(d), Media General requests a hearing on its motion for preliminary injunction no later than 21 days after filing, and requests that any temporary restraining order granted be extended as necessary until the motion for preliminary injunction can be heard.

## I.      INTRODUCTION

Media General, an owner of multiple television stations nationwide and one of the nation's largest connected-screen media companies, has a Joint Sales Agreement and a Shared Services Agreement with Schurz.  Pursuant to these agreements, Media General serves as the sales agent for WAGT, a television station in Augusta, Georgia, owned by Schurz, to market and sell all forms of regional and local spot advertising, sponsorships, direct response advertising, paid programming, and all long-form advertising broadcast on WAGT on an exclusive basis for the ten-year duration of the agreements, which do not expire until January 1, 2020.

In breach of its agreements with Media General, Schurz has entered into an agreement to sell WAGT and other stations to Gray, a Media General competitor that currently owns another major station in WAGT's market.  Because Gray already owns another major full-power station in WAGT's market, the FCC's "Duopoly Rule, 47 C.F.R. 73.3555(b), prohibits Gray from owning and operating WAGT in addition to the full-power station it already owns.  Accordingly, Schurz and Gray have informed the FCC that they will take WAGT silent upon the closing of the sale, and Gray has informed customers of Media General that WAGT's programming will be transferred to a low power "Class A" television station also owned by Gray in the market. Schurz and Gray have also indicated to the FCC that they intend to offer to sell WAGT's spectrum in the spectrum auction currently being administered by the FCC pursuant to federal law.  Each of these actions would constitute a breach of Schurz's agreements with Media General, which require Schurz, among other things, to:

(1) "not take any action or unreasonably omit to take any action that would be reasonably likely to result in a (x) revocation, non-renewal or material impairment of the FCC Licenses;"

(2) "use commercially reasonable efforts to maintain and renew the current Network affiliation agreement;"

(3) "use commercially reasonable efforts ... to continue the normal and usual transmissions of the Station so as to provide a broadcast signal;"

(4) "assign its rights and delegate its obligations under the Transaction Documents to any (i) successor in interest as the operator or licensee of the Station or (ii) purchaser of all or substantially all of the assets of such Service Station;"  and

(5) "negotiate in good faith to restore their economic positions" if a provision of the agreement is unenforceable or the FCC modifies its rules or policies in a way that raises substantial questions about the validity of the agreement.

Schurz's sale of WAGT to Gray would create a situation in which the continuing operation of the station would violate federal regulations, unless Gray were to simultaneously transfer WAGT to another party capable of legally operating it or to divest itself of the full-power station it already owns in the market.  It is for this reason that Schurz and Gray have already announced their intent to take WAGT silent, an act that they admit will cause Schurz's agreements with Media General to be "broken."

The sole defense offered by Schurz and Gray for their attempts to wipe their hands clean of the Joint Sales Agreement and Shared Services Agreement, is their self-defeating claim that the act of transferring the Joint Sales Agreement would place Media General in violation of the Duopoly Rule.  In other words, by creating a situation in which compliance with the agreements

would violate federal law, Schurz and Gray claim that they are excused from performance under the agreements.  Rather than saving Schurz and Gray from the consequences of their conduct, however, these claims only serve to further highlight the extent of their breaches, as the agreements do not permit Schurz to place the WAGT Station in violation of FCC rules, thereby imperiling WAGT's license and network affiliation agreement, and rendering it impossible to continue the operation of the station as required by the agreements.  Thus, before this Court are questions regarding whether Schurz and Gray's own actions to create a violation of FCC regulations cause a breach of the contracts or excuse their performance under the contracts.

II.     **JURISDICTION AND VENUE ARE PROPER IN THIS COURT BECAUSE MEDIA GENERAL'S CLAIMS INVOLVE A SUBSTANTIAL ISSUE OF FEDERAL LAW, AND MEDIA GENERAL SEEKS AN INJUNCTION PROHIBITING AN ACT IN THE DISTRICT OF COLUMBIA.**

Jurisdiction is proper in this court pursuant to 28 U.S.C. § 1331, which provides that district courts "shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  The Supreme Court has held that:

> Congress has given the lower federal courts jurisdiction to hear, originally or by removal from a state court, only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.

*Franchise Tax Bd. v. Construction Laborers Vacation Tr.*, 463 U.S. 1, 27-28, 103 S.Ct. 2841, 2856, 77 L.Ed.2d 420 (1983).  Under this "well-pleaded complaint" rule, courts look to the legal substance of the claims brought in the complaint, not just the causes of action.  *See, e.g., Bender v. Jordan,* 623 F.3d 1128, 1130 (D.C. Cir. 2010) ("IFSB's cause of action—breach of contract—appears on its face to be one created by state law.  But even where that is true, the federal courts have jurisdiction when, as here, it is apparent that the federal questions overwhelmingly predominate."); *Guardian National Acceptance Corp. v. Swartzlander Motors, Inc.*, 962 F.Supp.

1137, 1142 (N.D. Ind. 1997) ("Ordinarily, breach of contract claims arise under state law. However, under the well-pleaded complaint rule, courts ordinarily look to the legal *substance* of the plaintiff's claims rather than the value of the interests implicated when determining whether a federal question exists.")

Here, although Media General's complaint alleges claims against Schurz and Gray that include breach of contract and tortious interference with contract, the questions at the heart of this dispute turn on questions of federal law and substantially involve federal interests:

1. Would the FCC's Duopoly Rule place Schurz in breach of its contractual obligations by conveying WAGT to Gray, without obtaining a waiver from the FCC or otherwise arranging conveyance to a party that can legally own and operate the station under FCC regulations?

2. Is Schurz excused from its contractual obligation to assign the Joint Sales Agreement and Joint Services Agreement by virtue of Schurz's argument that any assignment of the Joint Sales Agreement would vitiate the agreement's grandfathered status under the 2015 Act and Consolidated Appropriations Act of 2016, § 628 (2015), which provides that the FCC's new regulations treating certain joint sales agreements as ownership interests for the purpose of the Duopoly Rule "shall not apply to a joint sales agreement . . . that was in effect on March 31, 2014"?

These questions are inherently federal in nature. *See, e.g., Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.,* 545 U.S. 308, 312, 125 S.Ct. 2363, 162 L.Ed.2d 257 (2005) (noting that the federal question doctrine "captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resorting to the experience, solicitude, and hope of uniformity that

a federal forum offers on federal issues.")  Moreover, in addition to seeking an injunction prohibiting the sale of WAGT to Gray, which would violate federal regulations, along with the corresponding transfer of WAGT's programming to Gray, Media General also seeks to enjoin the sale of WAGT's spectrum in the spectrum auction currently being administered by the FCC pursuant to federal law, a matter of uniquely federal interest.

Venue is proper in this Court because, pursuant to the Asset Purchase Agreement, Schurz's sale of WAGT and other stations to Gray is to close in Washington, DC.  It is that closing that Media General principally seeks to enjoin.  Moreover, the spectrum auction is being administered by the FCC in Washington, DC.  All parties to the sale agreement, including Schurz and Gray, have attorneys and agents in Washington, DC, according to the Asset Purchase Agreement.

## III.   STATEMENT OF FACTS

### A.   Schurz Has a Unique Contractual Relationship with Media General Relating to the WAGT Station.

Schurz entered into the Joint Sales Agreement with Media General on October 16, 2009 for an initial term of 10 years, beginning January 1, 2010.  *See* Declaration of Robert Peterson, attached hereto as Exhibit A ("*Peterson Decl.*"), at Exhibit 1.  Pursuant to the Joint Sales Agreement, Media General serves as the sales agent for the WAGT Station to market and sell all forms of regional and local spot advertising, sponsorships, direct response advertising, paid programming, and all long-form advertising broadcast on the Station on an exclusive basis for the duration of the agreement.  Simultaneously with the execution and delivery of the Joint Sales Agreement, the parties entered into a Shared Services Agreement under which Media General provides certain support services and makes available certain technical and other facilities to the Station.  *See Peterson Decl.* at Exhibit 2.

Joint sales agreements and shared services agreements better enable local broadcasters to secure bank financing, attract advertising revenue, produce original programming (including local news), and modernize their facilities.  Such agreements allow broadcasters to reduce their costs by, for example, using the same advertising sales force, sharing office space, and station equipment.  In a letter from Schurz to the FCC, dated February 26, 2014 (attached to Schurz's Comprehensive Exhibit), Schurz extolled the virtues of the Joint Sales and Shared Services Agreements to both Schurz and Media General:

> In Augusta, Georgia, Schurz acquired a bankrupt station in 1980 and the next year put it on the air as an NBC affiliate competing with two historically strong stations. That station – WAGT – introduced a full news schedule in 1997 and incurred substantial losses every year thereafter, despite significant investment in improved news programming. In 2009, faced with continuing losses and the impact of the recession, WAGT entered into JSA/SSA agreements with Media General. Both WAGT and Media General's station have since moved into a new state-of-the-art facility. The stations maintain separate news staffs. WAGT's employee count and ratings have grown as a result of the efficiencies created by sharing services with Media General.

*Peterson Decl.* at Exhibit 4.

Under these agreements, Media General shares substantial resources with Schurz to, among other things, (1) hire and train a sales force with knowledge of the local market to sell advertising; (2) build out, share and maintain technical equipment; and (3) provide all back-office, traffic, program recording, and other operational functions for the WAGT Station. Additionally, Media General has spent the last six years building goodwill and advertiser relationships in the local market, at great expense and effort, for the WAGT Station's NBC and CW programming streams. In exchange, Media General receives from Schurz (i) a "JSA Fee" based on a percentage of the station's net revenues and certain revenues received or collected from programming and advertisements, and (ii) a "Services Fee" as set forth in the Shared

Services Agreement.  These revenues and fees are inextricably dependent on the continued operation of the WAGT Station.

Schurz is therefore explicitly bound to certain continuing performance obligations to protect the significant investments Media General has made for the WAGT Station under the Joint Sales Agreement and Shared Services Agreement.  Among other obligations, the Joint Sales Agreement prohibits Schurz from taking "any action or unreasonably omit[ting] to take any action that would be reasonably likely to result in a (*x*) revocation, non-renewal or material impairment of the FCC licenses[.]"  *Id*. at Section 5.1(g).  Further, the Joint Sales Agreement requires Schurz to "use commercially reasonable efforts to maintain and renew the current [NBC] Network affiliation agreement with respect to the Station on terms and conditions substantially similar to those agreed to."  *id.* at Section 5.1(i), and to "use commercially reasonable efforts . . . to continue the normal and usual transmissions of the Station so as to provide a broadcast signal twenty-four (24) hours each day for seven (7) days each week," *id.* at Section 5.1(j).

Importantly, Schurz may only sell the WAGT Station if the seller assigns and the buyer assumes Schurz's obligations under the agreements.  *See id.* at Section 9.3(h).  And, to ensure that this obligation (and others) are adhered to, Schurz is required to deliver written notice to Media General within five business days of the execution and delivery of any sales agreement for the Station.  *Id.* at Section 9.3(d).

As explained in the Joint Sales Agreement, "the services to be provided by the parties under this Agreement are unique and . . .  substitutes therefor cannot be purchased or acquired in the open market."  *Id.* at Section 8.6.  Media General, therefore, "would be irreparably damaged in the event of a material breach of [the agreement]" by Schurz.   For this reason, the Joint Sales Agreement expressly permits the parties to request a decree for specific performance from any

court of competent jurisdiction "enjoining the other party to observe and perform such other party's covenants." *Id.*

Indeed, damages resulting from breach of the Joint Sales Agreement between Schurz and Media General would be exceedingly more irreparable now, as the services provided thereunder are more unique today than when the agreement was executed in 2009.  As a result of an amendment to the FCC's rules in 2014, the FCC now counts as an attributable ownership interest any joint sales agreement entered into after March 31, 2014 providing for more than 15 percent of a station's weekly advertising time. *See Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 (Attribution of Joint Sales Agreements in Local Television Markets)*, 29 FCC Rcd 04371 (2014) ("Report and Order") (amending 47 C.F.R. § 73.3555, note 2).  Combined with the FCC's Local Television Ownership Rule, 47 C.F.R. § 73.3555(b) (the "Duopoly Rule"), which, with limited exceptions not relevant here, prohibits common ownership of two top-four full-power stations within a Designated Market Area, the 2014 amendment would prohibit Media General from entering a new joint sales agreement that would be comparable to its existing agreement in the WAGT Station's market today, because Media General already owns a top-four station in that market.

The 2014 amendment does not affect joint sales agreements entered into prior to March 2014.  *See* H.R.2029 - Consolidated Appropriations Act, 2016 § 628 (2015) ("the amendments to the rules of the Commission adopted in such Further Notice of Proposed Rulemaking and Report and Order, shall not apply to a joint sales agreement . . . that was in effect on March 31, 2014[.]").  Media General's Joint Sales Agreement with Schurz is therefore a grandfathered interest that does not count towards Media General's ownership interest in the Augusta, Georgia, market.  Even absent Congress's "grandfathering" of existing joint sales agreements, Schurz and

Media General could preserve their Joint Sales Agreement through amendment of one discrete aspect—the percentage of weekly advertising sales—and indeed, the Joint Sales Agreement requires them to negotiate in good faith to restore their economic positions in the event the FCC modifies its rules or policies in a way that would jeopardize the validity of the agreement. *Peterson Decl.* at Exhibit 1, Section 9.7.  In other words, there has been no change in law that would permit Schurz to abandon its performance obligations under the agreements or to assign the Station to any party unwilling or unable to assume the agreements.

### B.    Schurz and Gray Television Group, Inc. Are Coordinating to "Break" the Joint Sales Agreement and the Shared Services Agreement.

On September 14, 2015, Schurz entered an Asset Purchase Agreement with Gray for the sale of multiple Schurz stations—including the WAGT Station.   *See Peterson Decl.* at Exhibit 3. The parties subsequently filed an application for FCC consent to the assignment of the stations to Gray.  *See* FCC File No. BALCDT - 20150917AEE, attached as Exhibit B.

Under Section 9.3(d) of the Joint Sales Agreement and Section 16 of the Shared Services Agreements, Schurz was required to deliver written notice to Media General of the executed sales agreement by September 21, 2015.  Schurz failed to deliver such notice.

Instead, with utter disregard for the contractual limitations that require Schurz to "assign its rights and delegate its obligations under the Joint Sales Agreement and Shared Services Agreement to (i) any successor in interest as the operator or licensee of the Station or (ii) purchaser of all or substantially all of the assets of such Service Station, Schurz has taken actions to sell the WAGT Station to Gray with actual knowledge that Gray legally cannot—and does not intend to—own or operate the WAGT Station.  Gray already owns a top-four station in the Augusta, Georgia market:  WRDW-TV, a CBS affiliate, and has not expressed any intention of

divesting or otherwise disposing of WRDW-TV; the Duopoly Rule therefore prohibits Gray from

legally owning and operating the WAGT Station.  *See* 47 C.F.R. 73.3555(2).

Gray and Schurz acknowledged the FCC's prohibition on such unlawful duopolies in

transactional documents filed with their FCC assignment application.  There, the parties noted

that:

> Gray owns and operates full power television stations in certain [DMAs] in which
> Schurz subsidiaries own full power television stations. . . . Because the
> Commission's Local Television Multiple Ownership Rule, 47 C.F.R. 73.3555(b)
> (the "Duopoly Rule") does not permit common ownership of two Top Four
> stations in a market, Gray will divest or otherwise dispose of one Top Four station
> in each of these markets.  As a result of these divestitures, at the closing of the
> transaction Gray's holdings in each market will be fully compliant with the
> Commission's rules.

Exhibit C, at 2. Divestitures of stations are common in large, multi-station sales

transactions, and the sale of the WAGT Station to a third party that does not already own

a top-four station in Augusta, Georgia, would allow the station to remain operational, and

with it, Media General's Joint Sales Agreement and Shared Services Agreement.

Despite this reasonable option, Schurz and Gray are planning instead to terminate the

agreements to the detriment of Media General.  In a revised Comprehensive Exhibit, Schurz and

Gray announced to the FCC that "[a]t closing, the joint sales agreement between [Media General]

and Schurz's NBC affiliate WAGT(TV) *will be broken*."  *Peterson Decl.* at Exhibit 4, p. 2

(emphasis added).  The revised Comprehensive Exhibit also made clear Gray's intentions to take

the WAGT Station off the air immediately upon consummation of the sale to and—

irrevocably—relinquish the WAGT Station's license in the FCC's upcoming spectrum auction.

*Id.* at 2, 16.

**C.      Schurz and Gray Plan to Transfer the WAGT Station's Network
Programming to Gray's Low Power Class A Station in Violation of the Joint
Sales Agreement and Shared Services Agreement.**

Further exacerbating the harms to Media General's commercial success in the Augusta market, has Gray begun contacting Media General's customers.  *See, e.g.*, *Peterson Decl.* at Exhibit 5.  In its unsolicited letters, Gray informed Media General's advertisers that Gray will remove the NBC and CW programming from the WAGT Station on February 1, 2016, and that "[t]he joint sales and services arrangements [with Media General] will not continue once the NBC and CW channels move to Gray on February 1st."  *Id.*  Gray and Schurz's plans to strip the WAGT Station of its network programming is akin to stripping a car for parts—the shell that remains retains virtually none of its original value.  Accordingly, such an act would be a breach of the Joint Sales Agreement's requirement that Schurz use commercially reasonable efforts to preserve the Station's network programming and to continue the normal and usual transmissions of the WAGT Station so as to provide a broadcast signal.

In addition, Gray alleged—in a thinly veiled attempt to disparage Media General—that "Media General/WJBF has not provided us with access to any of its sales contracts or records. We therefore have no ability to honor post-January 31st commitments that Media General may have made for broadcasts on the NBC and CW channels."  *Id.*

But the FCC has neither approved Gray's acquisition of the WAGT Station nor provided any indication that it will approve the transaction to permit closing by February 1, 2016.  It is therefore unclear what authority Gray believes it has to lawfully remove programming from the WAGT Station.  And because Schurz is contractually obligated to use commercially reasonable efforts to maintain the network affiliations for the WAGT Station, any effort by Schurz to transfer the WAGT Station's network programming to a Gray station would be in direct violation of its obligations to Media General.

Regardless of whether Gray is ultimately successful in taking the WAGT Station's network programming on February 1, it has deliberately interfered with, and continues to jeopardize, Media General's contractual relationships by soliciting Media General's customers to turn their confidential advertising contracts with Media General over to, and enter new contracts with, Gray.  In fact, as recently as January 22, 2016, a Gray sales representative emailed a Media General client to offer her two weeks of free advertising on Gray's station—a valuable enticement, particularly during the political primary broadcast season.  Peterson Decl, at Exhibit 6.  When the client pushed back and asked the sales representative instead to "just add bonus spots on WAGT" for her, the sales representative replied simply:  "I need the WAGT Order. Thanks!" *Id.*  The client continued to push back, responding "I can't send you my WAGT order. Does my WAGT rep just automatically go away on Feb. 1[?]"  *Id.*  Only after the Gray sales representative ultimately threatened "if the WAGT order is not in the Gray system, it will not air," the client reluctantly took steps to have her advertising orders sent to Gray rather than to Media General, directly harming Media General's ongoing customer relationships.  *Id.*  Gray's interference with Media General's customers is causing tremendous confusion, much to Media General's disadvantage.

Moreover, Media General just learned on January 27, 2016, that Schurz and Gray are in the process of directing cable companies to disconnect and move equipment necessary to effect a transfer of the WAGT Station's programming to Gray's station as of February 1, 2016.  *See Peterson Decl.* at Exhibit 11.

If the sale to Gray closes, or if the WAGT Station's programming is transferred to Gray's station, or if the WAGT Station's spectrum is relinquished in the spectrum auction administered by the FCC, then Media General will suffer immediate and irreparable harm.  Media General's

revenues from sales of advertising on the WAGT Station have been almost $6 million each year for the past two years.  They are projected to be well above $6 million in 2016, driven in large part by the Presidential election cycle and the Summer Olympics.  Media General's investments in the capability to meet its obligations under the agreements have been substantial, including building a new facility, training employees (including more than 60 employees who work primarily in Media General's facility for the service of the WAGT Station).  If WAGT is closed, all of those investments will be for naught.  Just as importantly, there would be no better way to generate ill will with Media General's customers than to fail to fill the customers' orders, many of which are already in place for February 2016, and beyond.  Media General will be unable to fill those orders, and will likely lose much of its goodwill with those customers and in the market, if Schurz and Gray go through with their plan to break the Joint Sales Agreement and Shared Services Agreement.

> **D.    Media General Has Repeatedly Objected to Schurz's and Gray's Actions, to No Avail.**

On October 29, 2015, Media General's Vice President, General Counsel and Secretary, Andrew Carington, spoke with Kevin Latek, Senior Vice President of Business Affairs at Gray, and raised concerns about Gray's attempted acquisition of the WAGT Station.  Following their conversation, Mr. Latek emailed Mr. Carington to "reiterate his surprise if Media General has been advised the August JSA could continue after Schurz sells the WAGT Station since the JSA then loses its grandfathered status and places Media General in violation of FCC ownership rules."  *Peterson Decl.* at Exhibit 7.  Dismissing Media General's concerns, Mr. Latek stated that "Gray will proceed with the Augusta transition the only way current law allows, namely to build out our new station operation immediately and launch the NBC/CW on our Class A station effective at the closing of the Schurz transaction."  *Id.*

14

On November 20, 2015, Media General again raised its objections, this time in a letter notifying Schurz and Gray that (1) Schurz is in material breach of its obligations under the Joint Sales Agreement and Shared Services Agreement and (2) Gray's actions have the clear purpose and effect of tortiously interfering with Media General's contractual rights. *Peterson Decl.* at Exhibit 8. Media General thoroughly explained that the Joint Sales Agreement is "completely enforceable and permissible in its current form" and that Mr. Latek's suggestion that the agreement would necessarily lose its grandfathered status upon sale of the station is "belied by Schurz's and Gray's own actions" – namely, that their assignment application seeks a waiver of the FCC's ownership rules to permit assignment to Gray of the "joint sales agreements currently in place in Wichita, Kansas and Springfield, Missouri following the Closing until at least December 31, 2016." *Id.* Notably, Congress has since removed any doubt that joint sales agreements entered into before March 31, 2014, are permissible through September 30, 2025, regardless of whether they are assigned or transferred to a new party. *See* H.R.2029 - Consolidated Appropriations Act, 2016 § 628 (2015).

For its part, in contrast with the representations it made to the FCC, Schurz claimed in its response that "Gray is assuming the rights and obligations of Schurz and WAGT under the Agreements pursuant to the [Asset Purchase Agreement]," even though Schurz knows that Gray cannot legally operate the WAGT Station. *Peterson Decl.* at Exhibit 9. Gray, on the other hand, reiterated its contention that "the WAGT JSA cannot be assigned to any third party under applicable law, because such an assignment would provide Media General with an illegal attributable ownership interest in WAGT(TV)." *Peterson Decl.* at Exhibit 10.

Additional communications between the parties and their counsel have followed to discuss the pending transaction, placing particular emphasis on Congress's recent legislation and

its impact on the WAGT Station's Joint Sales Agreement.  To date, Media General has been

unable to obtain any assurances from Schurz or Gray that the WAGT Station's operations,

programming, license, and agreements will not be deliberately impaired by the proposed

transaction.  To the contrary, all indications are that Schurz and Gray are actively in the process

of transferring programming from the WAGT Station on February 1, 2016. As a result, Media

General has no other option but to file this Motion for Temporary Restraining Order and

Preliminary Injunction to prevent further damages arising from (1) the sale of the WAGT Station

to Gray; (2) the removal of the WAGT Station's network programming to a Gray station; (3)

relinquishment of the WAGT Station's license in the spectrum auction; and (4) Gray's continued

solicitation of Media General's customers in the Augusta, Georgia, market.

## IV.   LAW AND ARGUMENT.

### A.   Legal Standard.

"The purpose of a preliminary injunction is merely to preserve the relative positions of

the parties until a trial on the merits can be held."  *Chaplaincy of Full Gospel Churches v.*

*England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citing *Univ. of Tex. V. Camenisch*, 451 U.S. 390,

395 (1981)).  "To warrant preliminary injunctive relief, the moving party must show (1) a

substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the

injunction were not granted, (3) that an injunction would not substantially injure other interested

parties, and (4) that the public interest would be furthered by the injunction."  *Id.*  "The district

court must balance the strengths of the requesting party's arguments in each of the four required

areas." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).  "If

the arguments for one particular factor are particularly strong, an injunction may issue even if the

arguments in other areas are rather weak.  An injunction may be justified, for example, where

there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *Id.*

### B.  There is a Substantial Likelihood That Media General Will Succeed on the Merits.

Media General is likely to prevail on its claims for breach of contract and breach of the implied covenant of good faith and fair dealing against Schurz as a result of Schurz's attempt to transfer the WAGT Station to Gray, thereby breaching both the Joint Sales Agreement and the Shared Services Agreement by creating a violation of federal regulations that will imperil WAGT's license and network affiliation, and render it impossible for the WAGT Station to continue operating as required.  Schurz's sale of the WAGT Station to Gray, by creating a violation of the FCC's Duopoly Rule, is a breach of these conditions and more.

Media General is also likely to prevail on its claims for tortious interference with contract and business expectancy against Gray as a result of (i) Gray's plan to break the Joint Sales Agreement once it obtains ownership of the WAGT Station, and (ii) Gray's attempts to solicit Media General's customers for its proposed new station.  Gray has done everything in its power to secure the transfer of the WAGT Station's ownership interests while destroying Media General's agreements with Schurz and its relationships with its customers.

Finally, FCC regulations—including the Duopoly Rule and rules dealing with grandfathered joint sales agreements—do not save Schurz and Gray from their actions.  Thus, for the reasons below, Media General is likely to prevail on the merits.

### 1.  Schurz's Transfer of Ownership of the WAGT Station to Gray Is a Violation of the Joint Services Agreement and the Shared Services Agreement.

The Joint Sales Agreement and the Shared Services Agreement both explicitly bar the results contemplated by Schurz and Gray through the proposed sale: the closure of the WAGT

Station and the transfer of its broadcast programming to Gray's Class A station.  A transfer of the station to a party that under federal regulations cannot and will not operate it is, on its face, a breach of those agreements.  Sections 9.3(c) and 9.3(h) of the Joint Sales Agreement require that Schurz assign its rights and delegate its obligations to any entity that purchases the WAGT Station and that "[a]ny assignment by [Schurz] under this Agreement shall include an assignment by Schurz of its rights and obligations hereunder."  *Peterson Decl.* at Exhibit 1, Section 9.3(c); Section 9.3(h).  Thus, although Schurz is permitted to sell the WAGT Station, it must also assign the Joint Sales Agreement and the Shared Services Agreements to the entity that buys it.

Likewise, the Joint Sales Agreement also prevents Schurz from selling the WAGT Station to an entity that cannot legally operate it under FCC rules.  Section 5.1(g) prevents Schurz from taking any action or failing to take any action that would likely result in, among other things, a "revocation, non-renewal or material impairment of the FCC Licenses" or a "material breach or default under the terms of any of the agreements to which [Schurz] is a party."  *Id.* at Section 5.1(g).  Schurz cannot meet this requirement because a sale to Gray would lead to a violation of the FCC's Duopoly Rule.  If Gray were to purchase the WAGT Station and attempt to operate it without divesting either the WAGT Station or Gray's WRDW-TV station, it would violate the FCC rules.  Thus, Schurz's attempt to sell the WAGT Station to Gray, without taking steps to prevent a violation of the FCC's rules, is a breach of the Joint Sales Agreement.

Schurz and Gray argue that assignment of the Joint Sales Agreement to Gray would place Media General in violation of the FCC's Duopoly Rule.  According to Schurz and Gray, the Joint Sales Agreements would have to terminate immediately upon transfer to any third party, even one who could lawfully operate the WAGT Station, because joint sales agreements in existence

prior to 2014 can be grandfathered only if they stay between the current parties to those agreements.

This claim is self-defeating.  Even if it was true, it would not save Schurz from its breach. There are several ways in which Media General could cure or prevent such a violation.  And if a transfer would place Media General in violation of the Duopoly Rule, the parties to the Joint Sales Agreement would be required, under Section 9.7, to negotiate in good faith to restore Media General's economic position.  *Id.* at Section 9.7.  By refusing to negotiate in good faith to explore alternative solutions that would avoid injury to Media General, Schurz has failed to meet its obligations under the agreement.

But Schurz and Gray's self-defeating claim is also inaccurate.  Contrary to Schurz and Gray's contention, the assignment of the Joint Sales Agreement does not alter its grandfathered status, especially in light of Congress's recent legislation extending the grandfathering period for such agreements from December 2016 to September 30, 2025.  *See Congress Extends Compliance Deadline for Television Joint Sales Agreements in Effect as of March 31, 2014*, Public Notice DA 16-44 (Jan. 14, 2016).  That legislation provides that the 2014 attribution amendment, the amendment limiting the availability of joint sales agreements beyond a certain date, "shall not apply to a joint sales agreement . . . that was in effect on March 31, 2014" and that "[a] party to a [television] joint sales agreement that was in effect on March 31, 2014, shall not be considered to be in violation of the ownership limitations of section 73.3555." *Id*. Because the Media General-Schurz Joint Sales Agreement was entered into prior to March 31, 2014, it can be assigned to a third party and can continue through January 1, 2020, the remainder of its term, without running afoul of the attribution amendment.  It can be assigned.  It simply

can't be assigned to Gray, because the Duopoly Rule prohibits Gray from owning the WAGT Station without divesting itself of WRDW-TV.

Moreover, even if it were true that assigning a joint sales agreement would break its grandfathered status, Gray could have and should have applied for a waiver to allow it to assume the obligations of the Joint Sales Agreement despite the assignment.  The FCC has granted waivers in the past, and could do so again.  Schurz could have required, as a condition of the sale, that Gray apply for and obtain a waiver that would have allowed it to operate the WAGT Station and assume the obligations of the Joint Sales Agreement.

Or, Schurz and Gray could have structured the sale of the WAGT Station to avoid breaking the Joint Sales Agreement and injuring Media General in spite of the potential violation of the Duopoly Rule that would exist if Schurz sells the station to Gray.  Instead of taking the WAGT Station off the air and selling it in the spectrum auction, Gray either could have divested the station to another entity that could operate it or Gray could have divested its current station in the Augusta, Georgia, market and operated the WAGT Station itself.  In either case, the Joint Sales Agreement could have been performed by the respective WAGT Station owner rather than be merely abandoned.  By failing to take permissible measures under federal law to prevent injury to Media General in its deal with Gray to sell the WAGT Station, Schurz is breaching the Joint Sales Agreement.

For these same reasons, Media General is likely to succeed on its claim for breach of the implied covenant of good faith and fair dealing against Schurz.  By attempting to transfer WAGT to a party that cannot assume the obligations of the Joint Sales Agreement without negotiating with Media General in good faith to restore Media General's economic position, Schurz has breached both the express terms of the contract and the covenant of good faith and fair dealing.

2. **Media General Is Likely to Succeed on Its Claim That Gray Interfered With the Joint Sales Agreement by Attempting to Break the Agreement and Steal Media General's Customers.**

To prevail on a claim for tortious interference with contract, a plaintiff must establish the following:

> (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of a contractual obligation or caused a party or third party to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

*Iguana, LLC v. Lanham*, 628 F.Supp.2d 1361, 1368 (M.D. Ga.2008) (*citing Culpepper v. Thompson*, 254 Ga. App. 569, 571, 562 S.E.2d 837, 840 (2002)).  These elements are easily met where Gray has purposely taken improper action to interfere with Media General's business and contractual relationships with both Schurz and Media General's advertising customers.

Not only has Gray entered into an agreement to purchase the WAGT Station from Schurz while simultaneously informing the FCC that it intends to "break" the Joint Sales Agreement between Media General and Schurz, it has also attempted to coerce the advertising customers that Media General has built up on behalf of WAGT as part of its obligations under the Joint Sales Agreement into entering similar contracts with Gray by sending them letters disparaging Media General and informing the customers of Gray's plan to move WAGT programming to Gray's other local station.  *Peterson Decl.* at Exhibits 4, 5.  In other words, Gray has sought to destroy the Joint Sales Agreement while still reaping its benefits at the expense of Media General.  As a result of Gray's efforts, if the sale is permitted to close, Media General will be unable to obtain the benefits of the Joint Sales Agreement as Gray will end the Joint Sales Agreement, take Media General's WAGT customers, and make it impossible for Media General to keep its customers as WAGT will no longer broadcast its network programming.

### C.    Media General Will Suffer Irreparable Harm Absent a Preliminary Injunction.

Both the Joint Sales Agreement and the Shared Services Agreement contemplate

obligations and benefits that are unique and difficult to replace given the highly competitive and

heavily regulated nature of the television industry.  As a result, the Joint Sales Agreement

specifically states that "the parties would be irreparably damaged in the event of a material

breach of [the Joint Sales Agreement]" by the other party, because "the services to be provided

by the parties under this Agreement are unique and . . .  substitutes therefor cannot be purchased

or acquired in the open market." *Peterson Decl.* at Exhibit 1, Section 8.6.  As noted above, this

is even truer now than it was at the time the parties entered into the Joint Sales and Shared

Services Agreements because current FCC rules, such as the Duopoly Rule and limits on joint

sales agreements, would prevent Media General from entering into a comparable joint service

agreement with another party.

In light of the difficulty of quantifying the unique services contemplated by the Joint

Sales Agreement, the agreement permits Media General to request "a decree of specific

performance be issued by a court of competent jurisdiction, enjoining [Schurz] to observe and

perform [its] covenants, conditions, agreements and obligations [under the agreement]." *Id*.  If

such a decree is sought, the agreement states that "the parties hereby agree neither to oppose nor

to resist the issuance of such a decree on the grounds that there may exist an adequate remedy at

law for any material breach of this Agreement." *Id*.  Therefore, Schurz is estopped from denying

that its breach of the agreements will cause Media General irreparable harm.

Termination of the agreement would, therefore, irreparably harm Media General.  In

addition to substantial lost profits—which Media General estimates to be in the range of $10 to

$20 million—such termination would extinguish years of goodwill and commercial success and

22

leave Media General stranded with sunk investment costs in building its facility and training its

employees, and lost efficiencies that it cannot recover or rebuild through a new joint sales

agreement.

**D.      The Only Injury to Schurz and Gray Resulting From an Injunction Will Directly Result From Their Inability to Breach the Joint Sales And Shared Services Agreements.**

A temporary restraining order and preliminary injunction would merely maintain the

status quo while this case is resolved.  Any harm to Schurz and Gray would be only to the extent

that they intended to benefit from the breaches of the Media General-Schurz Joint Sales

Agreement in the first place.  Because Schurz is not entitled to sell WAGT to a third party that

cannot legally operate it, neither Schurz nor Gray can justifiably complain regarding their

inability to realize the potential benefits of the sale of the WAGT Station on terms they should

never have contemplated in the first place.

**E.      An Injunction Would Serve the Public Interest Because it Would Prevent Schurz and Gray From Capitalizing on the Violation of Federal Law That They Have Engineered for Their Own Benefit.**

The public interest is served by an injunction that will uphold contractual obligations and

prevent Schurz and Gray from breaching the contracts for their own potential gain.  *See, e.g.*,

*PCTV Gold, Inc. v. SpeedNet, LLC.*, 508 F.3d 1137, 1145 (8th Cir. 2007) (finding that a district

court "did not abuse its discretion by concluding its grant of a preliminary injunction promoted

the public interest by protecting freedom to contract through enforcement of contractual rights

and obligations.").  Further, it is a clear and obvious violation of public policy to allow Schurz

and Gray to create a violation of FCC regulations for the purpose of getting out of their

contractual obligations.

The public interest would be served by an injunction preventing the sale of WAGT under

these circumstances, preventing the transfer of its programing and preventing the sale of

WAGT's spectrum in the FCC's spectrum auction.  The residents of Augusta, Georgia will continue to receive their NBC programming through WAGT's current station, no violation of FCC regulations will occur, and contract rights will be preserved.

**F.      A Temporary Restraining Order Is Necessary to Prevent Immediate and Irreparable Injury, Loss, and Damage If Schurz and Gray Carry Through With Their Plan to Transfer WAGT's Programming to Gray on February 1, 2016.**

Because Gray has repeatedly informed Media General's customers that WAGT's programming will be transferred on February 1, 2016, and because it has directed cable companies to take steps to prepare for the transfer on that date, it is clear that only a temporary restraining order will prevent the irreparable harm that Schurz and Gray are about to visit upon Media General.

**V.      CONCLUSION**

For the foregoing reasons, Media General respectfully requests that the Court enter a temporary restraining order and preliminary injunction preventing Schurz and Gray from (a) closing the sale of WAGT to Gray, (b) transferring the WAGT Station's programming to Gray's Class A station; (c) selling WAGT's spectrum in the FCC's spectrum auction; and soliciting Media General's customers in the Augusta, Georgia, market.

January 28, 2016                                Respectfully Submitted,
                                                Media General, Inc.


/s/ Matthew J. MacLean
Matthew J. MacLean (D.C. Bar No. 479257)
Matthew.maclean@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, N.W.
Washington, DC  20036
Phone:  202-663-8183
Facsimile:  202-663-8007

*Counsel for Plaintiff Media General, Inc.*